**MAINE GAS & APPLIANCES, INC.**

**v.**

**MORSE BROS. CO. et al.**

Supreme Judicial Court of Maine.

Dec. 3, 1969.

James E. Gagan, Portland, for plaintiff.

Powers & Bradford, Carl O. Bradford, and James G. Palmer, Freeport, for defendants.

Before WILLIAMSON, C. J., and WEBBER, DUFRESNE, and WEATHERBEE, JJ.

WILLIAMSON, Chief Justice.

This is an action by Maine Gas & Appliances, Inc. (Maine Gas) against Morse

**368**

Bros. Co. (Morse), Dwight G. Morse (Dwight), Morse Bros. Oil Co., Inc. (Pesco), and Richard J. Pescosolido arising from the termination of a contract between Maine Gas and a partnership which was the predecessor of Morse relating to the sale and servicing of liquefied petroleum gas (L P Gas) and equipment and also from the sale of the business of Morse to Pesco.

The Court below refused to enjoin the defendants:*

(a) from soliciting L P Gas business and selling or supplying L P Gas to any consumer who had been receiving L P Gas from Maine Gas through the defendant within the territory served by Morse for a period of one year from August 1, 1968:

(b) from disclosing to anyone other than the plaintiff any information concerning the names and address of such consumers: and

(c) from inducing or soliciting such consumers to use L P Gas of the plaintiff's competitors.

The Court below enjoined Dwight G. Morse from engaging in the sale or distribution of L P Gas or equipment within the territory which any of the Morse organizations had serviced for a period of one year from August 1, 1968.

The case is before us on appeal by the defendant, Dwight G. Morse, from the injunction issued against him and on appeal by the plaintiff, Maine Gas, from the refusal to grant the requested injunction.

The original agreement out of which this case has arisen was made in 1948 between Maine Gas and Morse Bros. Co., a partnership and predecessor in interest to Morse. Over the years there were changes in the partnership until the business was incorporated under the name of Morse Bros. Co. (Morse).

The 1948 Agreement reads in part:

"CO-OPERATIVE PLAN

MAINE GAS AND APPLIANCE CORPORATION,
DISTRIBUTORS OF LIQUEFIED PETROLEUM GAS
UNDER THE TRADE NAME OF
"MAINGAS."

DEALER FRANCHISE
-----------------------------

STANDARD 100 POUND SERVICE

AGREEMENT BETWEEN MAINE GAS AND APPLIANCE CORPORATION AND _____ Morse Brothers, _____ (DEALER)
_____ Lisbon Falls, Maine." _____

· · · · · · · · ·

"—Contract—

NOW THEREFORE, to accomplish these purposes, the Dealer and Maine Gas and Appliance Corporation mutually agree as follows:

1. The Dealer agrees to sell liquefied petroleum gas to consumers exclusively for Maine Gas and Appliance Corporation; and Maine Gas and Appliance Corporation agrees to furnish Dealer's requirements of liquefied petroleum gas in Maine Gas and Appliance Corporation's own containers on consignment."

* Injunction was not sought against Pescosolido.

Throughout the Agreement the reference to the parties is to the "Dealer" and the "Maine Gas and Appliance Corporation". The critical provision on non-competition follows:

"22. If and when this contract is ended, the Dealer shall neither directly *or* indirectly establish, conduct, manage, or be employed, or be financially interested in the sale or distribution of liquefied petroleum gas or equipment, within the territory which he has served, for a reasonable period thereafter."

Other pertinent provisions are:

"18. This contract contains the entire agreement between the parties hereto, and supersedes all previous service contracts between them, relating to gas sales and equipment used in connection with liquefied petroleum gas containers of one hundred pounds capacity by weight, or less.

19. Waiver by either party of a breach of any provision of this Contract shall not be considered as a waiver of any subsequent breach.

20. It is agreed that the parties, before the execution of this Contract, carefully and thoroughly investigated and considered the integrity and business honor of each other, that they are convinced that they can and will successfully and harmoniously work together, that the relationship here created is satisfactory and permanent, and that, therefore, this contract can be ended only by mutual agreement between them, or by breach of any provision of it, at the option of the party offended, or by failure of either party to pay any sums owed to the other, as agreed herein or otherwise.

21. If this contract shall come to a close for any reason, the Dealer shall return to Maine Gas and Appliance Corporation all uninstalled equipment, containers and container deposit receipts. Whereupon, Maine Gas and Appliance Corporation shall pay back deposits subject to set-off as provided herein."

The agreement was executed by the parties as follows;

"Signed by Dealer at Portland, Maine this twenty sixth DAY OF July 1948.

Morse Bros. Co.
(Dealer's Firm Name
By  s/  Willard C. Morse

Witness    J. J. Foley                    Its_____

This contract is not effective until executed by Maine Gas and Appliance Corporation at its office in Westbrook Maine. Executed by Maine Gas and Appliance Corporation, at Westbrook, Maine, by C. C. Turner its Vice President, on July 26, 1948.

Witness    J. J. Foley"

————◆————

The contract was with the Dealer. It was the "Morse Bros. Co." that was obligated to carry out the bargain. The partners were, of course, responsible therefor. "Dealer" in Section 22 insofar as it included individuals included at most those who at the time the contract was entered into were members of the firm. Dwight Morse, therefore, was not included. Whether the then partners other than Willard C. Morse, who signed the contract, were bound thereby we need not determine.

The facts with reference to Dwight Morse are not complex. It appears (1) that in 1948 he was not a partner and of course did not sign the contract; (2) that he subsequently became a partner and an officer in the firms and the corporation assuming and carrying out the 1948 agreement and obligations of the Dealer; and (3) that he did not know of the non-competitive clause in fact until December 1967 at or about the time of the sale to Pesco.

In our view the non-competitive clause, Section 22 of the agreement, did not bind new partners entering the firm. The agreement was signed neither by the party to be charged therewith, that is Dwight Morse, nor by a person lawfully authorized by him so to act. The Statute reads:

"No action shall be maintained * * * 8. Upon any agreement to refrain from carrying on or engaging in any trade, business, occupation or profession for any term of years or within any defined territory or both * * * unless the promise, contract or agreement * * * is in writing and signed by the party to be charged therewith, or by some person thereunto lawfully authorized." 33 M.R.S.A., Sec. 51(8)

Dwight Morse in entering the firm did not, as we construe the contract, obligate himself to a non-competition agreement signed for a firm of which he was not then a member.

In Hughes v. Gross, 166 Mass. 61, 43 N.E. 1031, 32 L.R.A. 620, the Massachusetts Court in dismissing an action to recover on an employment contract with the firm of A and B against Sommers, who entered the partnership on its continuance following the death of A, held for Sommers on the issue of the Statute of Frauds. Justice Holmes for the Court said:

"But the foregoing suggestions are not enough to lay a foundation for the liability of Sommers, even assuming that there was evidence warranting the inference that he was content to be bound unless Gross escaped, and that he made an oral contract on the terms of the written agreement. The declaration is on the written instrument, and the refusal to direct a verdict for Sommers must be taken as made either with reference to the pleadings, in which case Sommers must be shown to be a party to the instrument, or else on the evidence, irrespective of the pleadings, in which case, unless he is to be taken to have signed the writing, the statute of frauds would be a defense under our decisions. Hill v. Hooper, 1 Gray 131, Freeman v. Foss, 145 Mass. 361, 14 N.E. 141. It appears to us that this difficulty cannot be answered, except by attributing an oversubtle meaning to the firm signature and to the acts of the new partners. We cannot read "Gross and Strauss" as not only meaning all those who then were members of the firm, but also as purporting to name in advance all persons who might become members pending the contract. It follows that a verdict for Sommers should have been directed."

The principle of *Hughes* is equally applicable here. It would stretch the contract beyond the fair meaning of the word "Dealer" to include partners yet to be in a contract against competition.

Contracts of this nature must be clear and precise to avoid uncertainty and injustice. This agreement is not an employment contract or the sale of a business with reasonable limitations of time and place against competition.

Here, we have no more than a seller of a product entering into a contract of uncertain length of time with a buyer who agrees to sell the particular product which is one of many articles of merchandise sold by him. The seller contends that upon termination of the contract the individuals who were partners of the Dealer at any time during the life of the contract are bound by the noncompetition clause.

We are convinced that Section 22 of the agreement was designed to limit the Dealer and not the individuals interested in the Dealer whether a firm or corporation. A contract with the restrictions claimed by the plaintiff would, in our considered view, be contrary to public policy.

We recognize that a firm or partnership under our law is not strictly an entity in itself such as a person or corporation. It is well understood, however, that in many of its aspects a firm is so considered. The partners are responsible for the obligations of the firm, but the business unit is, we believe, fairly understood to be the firm.

It follows, therefore, that Section 22 of the agreement was not binding upon Dwight Morse, and therefore, the injunction against him should not have issued. In this view of the case, it is not necessary we consider the other issues raised by the Defendant in his appeal.

The appeal of Dwight Morse is sustained.

■ The position of the plaintiff, Maine Gas, on appeal is stated in its brief.

"The Plaintiff's complaint in this case was essentially a prayer for equitable relief to stop the Defendants from interfering with its customers.

The Defendants freely admit that they have no right to solicit any L P Gas customer who is under a binding tripartite contract between the customer, Maine Gas and the Defendants, but contend that they are free to compete with the Plaintiff with all the remaining L P Gas customers that they have served.

Therefore, at this point, the material issue is as to those remaining customers. Whose customers are they as between the parties * * * the Plaintiff's or the Defendants'?"

The Court, in denying a finding requested by the plaintiff, said,

"3. That (in substance) the use of Pesco Corp. of the "gas consumer list" was wrongful and its continuance so to do is wrongful."

*Answer*: This requested finding is denied, because of the fact, recited in the Decree, that the Morse customer list consisted of persons who were not only L P Gas consumers, but customers for other goods and services supplied by Morse. Maine Gas has no legal or equitable interest in the customers in the operation of Morse, apart from the L P Gas phase of its operation."

The fact in the decree referred to follows:

"While the customer list acquired by Pesco Corp. from Morse Bros. Co., included L P Gas consumers, by reason of those consumers also dealing with Morse Bros. Co. in other aspects of its business, —fuel oil, oil heating equipment, etc., Pesco Corp. did not purchase its L P Gas business and gas consumer list, as such. That came to Pesco Corp., in the words of Richard Pescosolido, "as frosting on the cake."

The plaintiff argues in substance that the agreement not to compete created a fiduciary relationship between the Dealer and Maine Gas as to the L P Gas customers for a reasonable period upon termination of the contract.

That this is the intent of the contract may readily be agreed without, however, placing a like restriction on Pesco. The agreement of Morse prior to its sale to Pesco not to compete with Maine Gas in the L P Gas business was not cast in terms of whether the consumers were customers of either Morse or Maine Gas.

The plaintiff specifically agrees that Pesco is not bound by the non-competition clause of the 1948 agreement.

Throughout the period from the purchase temporary arrangement under which L P Gas from Maine Gas was sold by Pesco was of Morse by Pesco in late 1967 until the ended, Maine Gas and Pesco were negotiating in an attempt to reach a new agreement relating to the L P Gas business to replace the Morse contract. In the end, negotiations failed.

With the ending of the uneasy relationship between Maine Gas and Pesco every vestige of the old Morse relationship was destroyed. Pesco, from as early as January 1968 through July 1968 with the full knowledge and approval of Maine Gas, serviced those who had been Morse customers with L P Gas obtained from Maine Gas. Now Maine Gas says in substance that the business relationship necessarily entered into with such customers under sanction of Maine Gas must be ended.

■ The plaintiff relies heavily on the principle that an employee is impliedly obliged not to use knowledge concerning his employer's customers obtained by reason of and in the course of his employment for the benefit of himself or a competitor of his employer. Abalene Exterminating Co. v. Oser, 125 N.J.Eq. 329, 5 A.2d 738;

Morgan's Home Improvement Corp. v. Martucci, 390 Pa. 618, 136 A.2d 838.

In the case before us the customers for L P Gas were obtained by Morse which in no sense could be called an employee of Maine Gas. For a long period no three party contract described above between the customer, Dealer, and Maine Gas was required by Maine Gas. The consumers or customers, except on the contracts noted, had business dealings only with Morse.

The plaintiff has sought to restrain the business activity of the defendants beyond the bounds of the 1948 agreement. It is limited, however, by the 1948 agreement; and as we have seen, there is no contention made that Pesco is bound thereby and in particular by the non-competition clause.

The injunction was properly refused and the appeal of the plaintiff is denied.

The entry will be:

Appeal of defendant, Dwight G. Morse, sustained; appeal of plaintiff denied.

TAPLEY, J., sat at argument but retired before the opinion was adopted.

MARDEN, J., did not sit.